IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| LARS KNIPP by his next friend, Deborah Stone; JAMES KIM, by his next friend, Grace Kim; SUSANNAH TROGDON, by her next friend, Samuel Trogdon; AMBI HEARD; SHAUN MITCHELL; and ROBERT CHAFFIN by his next friends, Tom Chaffin and Lena Margareta Larsson Chaffin, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO. |
| v. | ) ) | |
| GEORGE ERVIN "SONNY" PERDUE III, in his official capacity as Governor, State of Georgia; CLYDE L. REESE, III in his official capacity as Commissioner, Georgia Department of Community Health; DR. FRANK E. SHELP, in his official capacity as Commissioner, Georgia Department of Behavioral Health and Developmental Disabilities, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

INTRODUCTION

Plaintiffs are adults diagnosed with severe mental health or developmental

disabilities.  They need extensive supervision and assistance in order to live in the

community.  Until recently, such services were provided through a state Medicaid program called Service Options Using Resources in a Community Environment ("SOURCE").  Plaintiffs each received termination notices because the Georgia Department of Community Health opted to change the SOURCE program so that it would not serve individuals with mental health disabilities or developmental disabilities, unless such individuals also had a physical disability.

With the loss of SOURCE benefits, Plaintiffs will lose the services they need to continue to live in the community and will be at substantial risk of institutionalization.  The United States Supreme Court held in <u>Olmstead v. L.C.</u>, 527 U.S. 581, 587 (1999) that individuals with disabilities have the right to receive services in the most integrated setting appropriate to their needs unless such services would fundamentally alter the way in which the state provides services.  Now, more than ten years after the Olmstead decision, the State of Georgia has eliminated a program that enables a substantial number of individuals with psychiatric disabilities to live in the community.  Plaintiffs are entitled to injunctive relief requiring Defendants to continue to provide SOURCE or comparable services.

<u>STATEMENT OF FACTS</u>

Plaintiffs have severe chronic mental illnesses or developmental disabilities that cause them to need extensive supervision and personal assistance.  Plaintiffs

were receiving supervision and assistance in the community through the SOURCE

program, but were sent termination notices after Respondent Department of

Community Health opted to make changes to the SOURCE program.  Due to the

loss of these services, the Plaintiffs are now likely to have to enter institutions.

(Mason Decl. ¶¶ 17-99; Trogdon Decl. ¶¶ 8-31; Stone Decl. ¶¶ 3-30; Usher Decl.

¶¶13-38; Johnson Decl. ¶¶ 3-31; Elliott Decl. ¶¶ 15-96).

SOURCE is a Medicaid funded program in Georgia that enables adults with

disabilities who otherwise would have to live in an institution to live in the

community.  (Mason Decl. ¶¶ 7-16; SOURCE Manual).  SOURCE provides an

array of services in the community, including alternative living services ("ALS"),

personal support services, enhanced case management, and round the clock medical

consultations, as needed.  (Id., § 807).  ALS includes round-the-clock oversight in

the home and assistance with medications, meals, and other activities of daily living

with which the particular person with a disability needs assistance.  (Id.; Community

Care Services Program ("CCSP") ALS Manual).[1]  Personal support services are

similar to ALS but are provided to individuals on a shorter-term basis for

individuals who live with family members or other caretakers.  (Source Manual, §

---

[1] SOURCE ALS is to be provided in compliance with the CCSP ALS Manual.
(Source Manual, § 807).

807, Appendix DD; Trogdon Decl. ¶¶ 9, 10).  The ALS component of SOURCE costs the State of Georgia $35.00 a day for each participant.  (SOURCE Manual, Appendix DD).   This is compared to the per diem cost of $362 for adult psychiatric in-patient services at Georgia Regional Hospital Atlanta.  (GRH-A Cost of Care).

In 2007, through a bureaucratic process with the federal Center for Medicare and Medicaid Services ("CMS"), the Georgia Department of Community Health moved the SOURCE program out of the State Medicaid Plan and into a 1915(c) Home and Community Based Medicaid Waiver Program ("Medicaid Waiver").[2] (Ivey Aff. ¶¶ 3-4).  SOURCE was moved into the state's Elderly and Disabled Medicaid Waiver ("E&D Waiver") in October 2007.  The Georgia Department of Community Health had previously elected to limit the E&D Waiver to the following two categories of adults with disabilities:  "Disabled (Physical)" and "Aged."  (Id.).

After the transfer of SOURCE to the E&D Waiver, the SOURCE program continued to admit individuals whose disabilities were exclusively mental illnesses or developmental disabilities.  In fact, the State of Georgia submitted a Declaration in federal court in *United States v. State of Georgia*, Civil Action No. 1:09-CV-

---

[2] Medicaid Waivers are Medicaid programs offered by states that have been authorized by the federal government to waive certain Medicaid statutory requirements giving them more flexibility in Medicaid program operation.

0119-CAP United States District Court, Northern District of Georgia by the Georgia Commissioner of the Georgia Department of Behavioral Health and Developmental Disabilities in February 2010 stating, "Georgia has . . . . opened the SOURCE program to the mental health and developmentally disabled population."  (Shelp Decl. ¶ 41).  In spite of Dr. Shelp's statement, the Georgia Department of Community Health and its SOURCE providers began terminating individuals from the SOURCE program at the end of 2009 whose disabilities were mental illness or developmental disabilities.  (Trogdon Decl. ¶ 21; Mason Decl. ¶ 93).

## LARS KNIPP

Lars Knipp is a twenty-year old man, who has been diagnosed as having schizoaffective disorder, schizophrenia, and bipolar disorder.  He has a history of harming himself and violence toward others.  He regularly experiences hallucinations.   (Stone Dec 3-5; 13-15; 19; Elliott Decl. ¶¶16, 18).

Up until his current stable placement in a SOURCE funded personal care home, Mr. Knipp had been in and out of hospitals for mental illness repeatedly over the last four years.  Mr. Knipp was hospitalized for his mental illness at Wellstar Hospital on six separate occasions between July 2006 and December 2009.  He was hospitalized in July 2006 after experiencing delusions and hallucinations and for being violent.  (Stone Decl. ¶ 9; Elliott Decl. ¶ 18; Knipp Medical ("Knipp") pp. 3,

11, 13).  He was hospitalized in January 2008 for suicidal ideation, experiencing

hallucinations, and exhibiting bizarre behavior, including talking to the television

and radio that were not on.  (Stone Decl. ¶ 9; Elliott Decl. ¶ 18; Knipp pp. 28-40).

He was hospitalized in March 2008 when he was diagnosed as being actively

psychotic and experiencing auditory hallucinations.  (Stone Decl. ¶ 9; Elliott Decl. ¶

18; Knipp pp. 93 -96, 119, 163).   He was hospitalized in June 2008 when he was

experiencing auditory and visual hallucinations and racing thoughts.  (Stone Decl. ¶

9; Elliott Decl. ¶ 18; Knipp p. 173).  He was hospitalized in January 2009 after

physically threatening a personal care home provider and experiencing

hallucinations.  (Stone Decl. ¶¶ 9, 13; Elliott Decl. ¶ 18; Knipp pp. 383, 534).  And,

he was hospitalized in December 2009 for physically threatening someone in his

personal care home.  (Stone Decl. ¶ 9; Elliott Decl. ¶ 18; Knipp pp. 534-536).

Between his visits to Wellstar in July 2006 and January 2008, he spent a week at

Riverwoods Psychiatric Center and a month and a half at Devereux Institute, which

is an institution for children with emotional and behavioral difficulties.  Mr. Knipp

was at Northwest Georgia Regional Hospital, a state mental health facility, from

January 16, 2008 through February 29, 2008 and returned there in March 2008.

(Stone Decl. ¶ 9; Elliott Decl. ¶ 18).   Mr. Knipp was also hospitalized at Atlanta

Medical Center for mental health reasons in March 2008.  (Stone Decl. ¶ 9; Elliott Decl. ¶ 18).

In addition to his frequent hospitalizations, Mr. Knipp has lived in four different personal care homes over the last two years.  He has had difficulty finding a place to live that worked out for him until now.  (Stone Decl. ¶ 10).

In January 2009, Mr. Knipp was going to a personal care home called Loving Arms.  Almost immediately, he started beating the dash of the car and threatening the personal care home provider.  The police brought Mr. Knipp from Loving Arms to Wellstar.  He was having serious hallucinations at the time.  (Stone Decl. ¶ 13; Elliott Decl. ¶¶ 21-22; Knipp pp. 383, 534).

Wellstar found a personal care home that would provide supervision and assistance to Mr. Knipp that was paid for by SOURCE.  Unfortunately, that personal care home later decided only to serve people with developmental disabilities.  Mr. Knipp went to another personal care home, but he was only able to stay there twelve days before he was hospitalized again for threatening the personal care home operator.  (Stone Decl. ¶¶ 17-19; Elliott Decl. ¶¶ 23-24; Knipp pp. 534-36).

After an exhaustive search for yet another personal care home, Mr. Knipp's SOURCE case manager ultimately found him a personal care home operated by Ray

Johnson.  Mr. Knipp moved into Mr. Johnson's personal care home in December 2009.  (Stone Decl. ¶¶ 20-22; Elliott Decl. ¶ 25).

Mr. Knipp is doing as well as he has done in a long time.  His grades in school are up, and he has not been hospitalized or had a major mental health crisis since he entered Mr. Johnson's personal care home.  (Stone Decl. ¶¶ 21-23; Johnson Decl. ¶ 14; Wooten Decl. ¶ 3).

In the personal care home, Mr. Knipp receives ALS funded by SOURCE.  He receives twenty-four hour supervision while he is at home.  (Wooten Decl. ¶ 10). He is given his medications at the proper times, and his assistant documents each time Mr. Knipp takes his medications.  (Wooten Decl. ¶ 11; Johnson Decl. ¶¶ 8, 9). His main assistant has figured out how to respond to Mr. Knipp's outbursts and knows how to calm him down.  (Wooten Decl. ¶¶ 8, 9).  Mr. Wooten also monitors Mr. Knipp's food intake, because Mr. Knipp is prone to binge eating and stealing food.  Recently, Mr. Knipp snuck downstairs, opened two uncooked cans of biscuit mix, and ate them.  (Wooten Decl. ¶¶ 5-7).  Mr. Wooten assists Mr. Knipp with household chores and personal grooming.  For instance, Mr. Knipp receives help with putting his toothpaste on his toothbrush because he is not able to do that correctly.  (Wooten Decl. ¶¶ 14-15).

Mr. Knipp was sent a letter on January 29, 2010 stating that he was terminated from the SOURCE program for not meeting "level of care."  Mr. Knipp's mother filed an appeal for him.  The case is currently before an Administrative Law Judge on cross motions for summary judgment.  (Stone Decl. ¶¶ 25-27).  Pursuant to SOURCE rules, Mr. Knipp will lose his SOURCE funding immediately if and when he loses his SOURCE administrative appeal.  (Stone Decl. ¶ 28; SOURCE Manual p. XIV-16, #10).

Mr. Knipp cannot stay in his personal care home if he loses his SOURCE services.  (Johnson Decl. ¶ 18).  Mr. Knipp will lose the other SOURCE services he receives, including enhanced case management and regular visits by a SOURCE nurse.  Neither the Georgia Department of Community Health nor the SOURCE provider have offered Mr. Knipp any services to replace what he has been receiving through SOURCE.  (Stone Decl. ¶ 30; Johnson Decl. ¶ 21; SOURCE Manual p. XIV-16, #10).

In August, Mr. Knipp met with Plaintiff's expert witness, Dr. Richard Elliott. Dr. Elliott is a board certified Psychiatrist and currently a Professor of Community Medicine at Mercer University School of Medicine.  Dr. Elliott has extensive experience and professional expertise as both an administrator and a clinician providing behavioral health care services for individuals with serious mental illness,

developmental disabilities, and/or co-occurring substance abuse disorders, in both institutional and community settings.  (Elliott Decl. ¶¶ 4-9, 15).

In Dr. Elliott's opinion, Mr. Knipp will have to be hospitalized again in the near future if he loses his SOURCE funded services, particularly the twenty-four hour supervision and assistance with medications.  The loss of Mr. Knipp's SOURCE services and his current personal care home would destabilize Mr. Knipp and cause him to decompensate.  This would cause great harm to Mr. Knipp.   This opinion is based on Mr. Knipp's particular mental illness, his frequent hospitalizations, his history of failed personal care home placements, and his need for supervision and assistance.  (Elliott Decl. ¶¶ 33-35).

## JAMES KIM

James Kim is a 28 year-old man diagnosed with schizophrenia and a traumatic brain injury.  He has seizures and delusions.  (Mason Decl. ¶ 17; Elliott Decl. ¶ 37; Kim Decl. ¶ 3).  He most recently had a two-minute grand mal seizure in July 2010.  (Elliott Decl. ¶ 39; Kim Medical Records ("Kim Med.") pp. 1018-1019).

Mr. Kim was hit by a car when he was five years old when he was chasing a ball.  He suffered a major head and brain injury and was in a coma for over two months.  (Kim Decl. ¶ 3).

Due to his traumatic brain injury, Mr. Kim has significant problems controlling his anger.  (Kim Decl. ¶ 5; Elliott Decl. ¶ 37; Mason Decl. ¶ 32).  He has punched a hole in a wall, thrown down a television set destroying it, and caused other damage to his current house.  (Mason Decl. ¶ 32).  He often tries to hurt himself.  (Mason Decl. ¶¶29-30; Elliott Decl. ¶ 39; Kim Decl. ¶¶ 11-12; Kim Med. pp. 185-189; 467-68; 617-620; 659-660; 706-710; 910, 966).

Mr. Kim has been receiving SOURCE services in a personal care home operated by Gwinnett Homes since February 2009.  (Mason Decl. ¶ 20).  Mr. Kim went to Gwinnett Homes after he had been in and out of Summit Ridge Hospital on several occasions for hurting himself and causing property damage.  He once punched a hole through a window while living with his Mom and Dad and then kept hitting his head against the window.  His parents decided they could no longer manage him at home.  (Kim Decl. ¶¶ 11-17; Mason Decl. ¶ 21; Kim Med. pp. 185-189; 467-68; 617-620; 659-660; 706-710).

Mr. Kim was hospitalized most recently at Georgia Regional Hospital Atlanta in July 2010 after attacking a hospital employee at a referring hospital, threatening to commit suicide with a knife, causing property damage, and causing a public disturbance.  He was able to leave the hospital and return to the Gwinnett Homes

personal care home in part because he had a stable place to which to return.  (Mason Decl. ¶ 26;  Elliott Decl. ¶ 39; Kim Med. pp. 906-12; 966).

Gwinnett Homes provides Mr. Kim with ALS.  Mr. Kim is provided twenty-four hour supervision while he is in the home, assistance with his medications, prepared meals, and transportation.  The personal care home also provides him personal support services.  The personal care home director, Seema Mason, continuously works to negotiate and work with individuals when Mr. Kim has difficulties with such persons due to his disability, including most recently speaking on Mr. Kim's behalf at a criminal hearing.  (Mason Decl. ¶¶ 31, 33-38).  Mr. Kim is also provided case management and nursing services through SOURCE.  Mr. Kim does not have any day services, because he was kicked out of his day program for not following rules and walking away. (Mason Decl. ¶ 37).

Mr. Kim was sent a termination notice from the SOURCE program on March 1, 2010.  Mr. Kim appealed the SOURCE termination.  He has an administrative hearing scheduled for September 28, 2010.  He will lose his SOURCE funding immediately if he loses his SOURCE appeal.  When Mr. Kim loses his SOURCE funding, he will be discharged from his personal care home, and he will lose his SOURCE services.  (Mason Decl. ¶¶ 40-42; SOURCE Manual p. XIV-16, #10).

Mr. Kim has applied for a different Medicaid Waiver due to his traumatic brain injury, but an assessment has not been completed of him to date and he has not been admitted into the program.  (Mason Decl. ¶ 44).

Dr. Elliott met with Mr. Kim and reviewed his hospital records.  Dr. Elliott's opinion is that Mr. Kim would be a threat to himself or others within weeks if he loses his SOURCE funded ALS.   In his opinion, Mr. Kim would be committed to a mental health institution or incarcerated within weeks if he loses his SOURCE funded ALS.  He needs the supervision and assistance he has been receiving from the ALS through SOURCE.  (Elliott Decl. ¶¶ 36; 40-42).

According to Dr. Elliott, Mr. Kim would very likely not continue his current medications.  As a result, his psychosis and impulse control would worsen, and he would become a threat to himself or others.  In addition, if Mr. Kim does not take his seizure medication, he would begin suffering seizures, which might cause permanent impairment or death.  (Elliott Decl. ¶ 43).

## SUSANNAH TROGDON

Susannah Trogdon is a forty-three year old woman with mental retardation, which she had since she was a child.  (Trogdon Decl. ¶¶ 3, 12; Elliott Decl. ¶ 57; 1992 Psychological Addendum; 2000 Vineland Adaptive Assessment; August 2010 Report of Psychological Evaluation).  She lives with her father Samuel Trogdon,

who is seventy years old, and her thirty-nine year old brother, who is often not home.  (Trogdon Decl. ¶¶  2, 7).

Ms. Trogdon is not able to be on her own for more than five or ten minutes without being at risk of injury, according to her father.  On one occasion when Mr. Trogdon had to leave her alone for a few minutes while he ran to the corner pharmacy, Ms. Trogdon placed a plastic bowl on the stove and turned on the burner. She melted the plastic bowl.  (Trogdon Decl. ¶¶ 12-14).

Ms. Trogdon does not know how to use a phone or call for emergency services.  When handed a phone, she could not demonstrate how to use it.  (Trogdon Decl. ¶ 14; Elliott Decl. ¶ 52).

Each time Ms. Trogdon would take a bath on her own, she would let the water overflow because she would not think to turn the bath water off.  It happened so many times her father had to replace the floor in the bathroom.  She no longer takes unsupervised baths.   (Trogdon Decl. ¶ 15).

Ms. Trogdon also needs assistance with baths and mobility because she suffers from vertigo and has frequent falls. (Id. ¶ 16).  Ms. Trogdon is not able to go shopping, manage her money, or use public transportation on her own.  (Id. ¶¶ 19-20).

14

Ms. Trogdon's mother, who was her primary caregiver, passed away in 2005. Ms. Trogdon went to live in a personal care home for a short time after her Mom's death, but then returned to live with her father within a year.  (Id. ¶¶ 5, 7). Ms. Trogdon was able to come live with her father because she had been approved for SOURCE.   As part of her SOURCE, she received enhanced case management and, more importantly, five and a half hours of personal support each day from Monday through Friday.  The personal support came from an aide, who would assist Ms. Trogdon with bathing, brushing her teeth, meal preparations, taking her medications, and supervising her.   (Id. ¶¶ 8-10).

Ms. Trogdon was sent a notice of termination from the SOURCE program on December 29, 2009.  She appealed and had an administrative hearing.  The Department of Community Health's decision was affirmed on July 1, 2010 due to the fact that individuals with developmental disabilities are no longer eligible for SOURCE.  She lost her SOURCE funding on the date of her hearing, and she no longer receives the case management or personal support services.  (Id. ¶¶ 21-25).

Mr. Trogdon has attempted to obtain other services for Ms. Trogdon, including applying for a Medicaid waiver for developmental disabilities and seeking day services.  To date, he has not been able to obtain any other services for Ms. Trogdon.  (Id. ¶¶ 28-30).

The loss of SOURCE for Ms. Trogdon has been a huge blow for both Ms. Trogdon and her father.  Her father has to make sure someone is with Ms. Trogdon at all times, and usually it has to be him.  He cannot take care of his real estate business.  The constant care for Ms. Trogdon is taking a physical toll on him.  He will not be able to keep his daughter with him much longer without the personal support being restored.   (Id. ¶¶ 26, 27, 31). "I will probably end up bankrupt due to our loss of income, and I cannot survive on social security alone.  My nerves are frayed and I am exhausted.  I will have to assess the situation each month.  I am trying my best to hold on because I love my daughter.  I just don't know how much longer I can keep this up."  (Id. ¶ 31).

Dr. Elliott met with Ms. Trogdon and reviewed assessments of her.  He determined that Ms. Trogdon has mental retardation and will need twenty-four hour supervision.  She will very likely be admitted to an institution if she cannot have services similar to what she had been receiving through SOURCE restored.  (Elliott Decl. ¶¶ 57-59).

## AMBI HEARD

Ambi Heard is a 34 year-old woman diagnosed with schizophrenia and bipolar disorder associated with physical aggression.  She experiences paranoia and delusions.  (Mason Decl. ¶ 47; Elliott Decl. ¶ 62).

Ms. Heard says that she hears things that others cannot hear and that are too advanced for other people to understand like God and the devil.  She says that she took herself to jail once to see what it feels like to have control from God.  She often states that she is an angel and that she has lived for billions of years.  (Mason Decl. ¶ 56).

At times, Ms. Heard has been violent.  She has slapped staff members and her roommate.  (Mason Decl. ¶¶ 47, 64).

Ms. Heard came to Gwinnett Homes on December 28, 2007 after being discharged from Anchor Hospital where she had been receiving in-patient mental health treatment for serious delusions from November 11, 2007 to December 28, 2007.  She believed that she was transforming into an angel.  (Mason Decl. ¶49; Heard Medical Records ("Heard") pp. 9-11).

Ms. Heard was transferred to Gwinnett County because she had had several failed attempts at living in personal care homes in Atlanta.  Prior to going to Anchor Hospital, Ms. Heard had been homeless living near Moreland Avenue in Atlanta, Georgia.  She was not taking her medications at that time.  (Mason Decl. ¶ 49).

Ms. Heard was admitted into the SOURCE program on January 14, 2008.  As part of her ALS, Ms. Heard is provided with supervision and her medications. She is

also given prepared meals and assisted with her daily activities.  (Mason Decl. ¶¶ 53, 54, 62, 67, 69).

Her assistants in the personal care home are proactive in working with her. As part of her ALS, they provide her with twenty-four hour supervision when she is in the house, and they know how to respond to her needs, particularly when she becomes aggressive.  (Mason Decl. ¶ 64).

In February 2009, Ms. Heard was hospitalized at Summit Ridge due to increased erratic behavior, delusions, and refusal to take medications.  She was in the hospital from February 23, 2009 to March 3, 2009.   Ms. Heard was able to be discharged from Summit Ridge relatively quickly because she had a stable place to which to return where she could receive ALS and other services.   (Mason Decl. ¶¶ 57-58).

Ms. Heard was sent a termination notice from the SOURCE program on February 10, 2010 stating that she was being terminated for not meeting level of care.  Ms. Heard appealed.  She has an appeal hearing on September 23, 2010.  If Ms. Heard loses her appeal, she will be immediately terminated from SOURCE.  If Ms. Heard is not able to keep her SOURCE benefits or have a similar financial subsidy for ALS, then she would have to leave her personal care home.  (Mason Decl. ¶¶ 70, 71, 73).

Dr. Elliott met with Ms. Heard and reviewed her medical records from Anchor Hospital and her SOURCE records.  It is his opinion that Ms. Heard would become non-compliant with her medications if she lost her SOURCE funded ALS. If she became non-compliant with her medications, this would result in her decompensating, with exacerbation of psychotic symptoms.  She would once again be hospitalized for an inability to care for herself and an imminent risk of harm to herself and possibly others due to her tendency toward violence during her psychosis.  (Elliott Decl. ¶¶ 63, 68, 69).

## SHAUN MITCHELL

Shaun Mitchell is a 30 year-old man diagnosed with schizophrenia. Mr. Mitchell came to Gwinnett Homes in October 2008 after having been at Georgia Regional Hospital Atlanta for four months for his mental illness.  (Mason Decl. ¶¶ 76-77).  While at Georgia Regional, Mr. Mitchell was diagnosed as being psychotic. Mr. Mitchell had been in a personal care home prior to his four-month hospitalization in 2008.  He had not been taking his medications and had threatened his personal care home provider.  (Mason Decl. ¶¶ 79-80; Elliott Decl. ¶ 71; Mitchell Medical Records pp. 5-7; 15-20).

Mr. Mitchell's personal care home provider, Seema Mason, met Mr. Mitchell at Georgia Regional Hospital Atlanta.  The Georgia Regional Hospital social worker

and Ms. Mason worked out that Mr. Mitchell would come to the personal care home

with the understanding that he would apply for and receive SOURCE funding for

ALS.  (Mason Decl. ¶ 78).

Mr. Mitchell's psychosis was still active when he was discharged from

Georgia Regional and admitted into Ms. Mason's personal care home.  (Mason

Decl. ¶ 81).  His global functioning was 30.  This is from the Global Assessment of

Functioning Scale, which is a tool used to report a clinician's judgment of the

overall level of functioning and carrying out of activities of daily living for an

individual.  It is a 100 point scale measuring overall level of psychological, social,

and occupational functioning.  A 30 generally connotes behavior considerably

influenced by delusions or hallucinations or serious impairment of judgment or

inability to function in almost all areas.  Individuals are often committed to

institutions when they have a score of below 50.    (Elliott Decl. ¶¶ 72-73; Mitchell

Medical Records 144).

Mr. Mitchell has become much more stable since living in Ms. Mason's

personal care home.  Mr. Mitchell remains stable, in part, due to the fact that he

receives Risperdal shots every two weeks from a SOURCE funded nurse.  Risperdal

is an anti-psychotic used for the treatment of schizophrenia.  This medication lasts

for two weeks.    (Mason Decl. ¶ 84; Elliott Decl. ¶ 77).

Mr. Mitchell also needs the other ALS services he receives, particularly the provision of transportation, meal preparation and provision, and coordination of doctor visits.  (Mason Decl. ¶ 86-87).

Mr. Mitchell's SOURCE has been in limbo since the end of 2009.  When the SOURCE provider checked the Department of Community Health website, it showed that Mr. Mitchell was active with SOURCE, so Ms. Mason has continued to provide services for him.  However there have been no SOURCE payments for him since the end of 2009.  (Mason Decl. ¶¶ 92-93).

While a SOURCE termination letter exists from the end of 2009, neither Ms. Mason nor Mr. Mitchell received it.  Ms. Mason can no longer continue to provide services to Mr. Mitchell without SOURCE.  She will have to discharge him from her personal care home.  (Mason Decl. ¶¶ 93, 95).

It is Dr. Elliott's opinion that Mr. Mitchell would not take his medications if he lost the SOURCE funded shots every two weeks and did not have someone providing him with medication assistance.  If this happened, he would decompensate very quickly and very likely be institutionalized in a mental health hospital.  (Elliott Decl. ¶ 77).

# ROBERT CHAFFIN

Robert Chaffin is a 55 year-old man diagnosed with schizophrenia.  He has hallucinations, delusions, and paranoia.  (Usher Decl. ¶ 19; Elliott Decl. ¶ 80).  After meeting with Mr. Chaffin, Dr. Elliott stated that Mr. Chaffin was one of the most severely mentally ill people he had met who was living in the community.  (Elliot Decl. ¶ 79).

Mr. Chaffin often gets so paranoid that he won't talk to anyone.  Often, he will not spend more than five or ten minutes out of his room with others before he rushes back to his bed and pulls a sheet over his head.  (Usher Decl. ¶ 25).

Mr. Chaffin has many delusions, including that he works at a gas station, is connected to FBI informants, and that he once belonged to the Mafia.  (Usher Decl. ¶ 20). Mr. Chaffin has a very hard time going to new places.  He often refuses to get out of the car when he goes to a new place.   (Usher Decl. ¶ 22).

Mr. Chaffin wears his eyeglasses bent to an almost impossible angle.  Mr. Chaffin previously had a pair of eyeglasses that were bent to this degree.  When Mr. Chaffin was given a new pair of eyeglasses, he bent the new pair so that they were distorted to the same significant degree as his old pair.  According to Dr. Elliott, this is an example of the degree to which Mr. Chaffin is unable to tolerate change in his environment.  (Elliott Decl. ¶ 82).

Mr. Chaffin has been receiving SOURCE funded ALS in a personal care home operated by Betty Usher since February 2008.  He came to live in Ms. Usher's personal care home after his elderly mother became too sick to care for him and she had to enter an assisted living facility.  He had lived with her his entire life.  (Usher Decl. ¶ 17).

As part of his ALS, Mr. Chaffin received twenty-four hour supervision, assistance with his medications, and extensive assistance with all regular activities of daily living.  (Usher Decl. ¶¶ 27-36).  For instance, Mr. Chaffin needs and receives assistance buttoning his shirt.  (Usher Decl. ¶ 33).  Mr. Chaffin needs reminders and significant prompting not to put on his dirty clothes, which he prefers, and to get in the bath water.  (Usher Decl. ¶¶ 33, 35).  Ms. Usher found Mr. Chaffin a person with whom he feels comfortable who shaves Mr. Chaffin.  (Usher Decl. ¶ 36). He has sometimes been threatening toward his personal care home assistants, but they know him and know how to get him to calm down.  (Usher Decl. ¶ 21).

Ms. Usher has also found Mr. Chaffin day programs.  She originally found him a program in Kirkwood, but when that fell through, Ms. Usher arranged for Mr. Chaffin to receive Assertive Community Treatment ("ACT") services through New

Joshua, which is a wellness and recovery center for mental illness, as well as a five-day a week peer support program. (Usher Decl. ¶ 28).

Mr. Chaffin was sent a letter terminating him from the SOURCE program in February 2010. Mr. Chaffin appealed the termination. He had an administrative hearing, which he lost on July 1, 2010 due to the change in eligibility criteria for SOURCE. Mr. Chaffin has not been on the SOURCE program since that date. (Usher Decl. ¶¶ 10, 13, 38).

Despite his loss of SOURCE, Ms. Usher has not yet discharged Mr. Chaffin because she is afraid he would end up in a hospital very quickly. "He is so fragile." (Usher Decl. ¶ 38). Ms. Usher will not be able to keep Mr. Chaffin for much longer without SOURCE funding. (Usher Decl. ¶ 13).

According to Dr. Elliott, Mr. Chaffin has an extreme need for stability. The slightest change in his life, including a change in his services or his home, will put his life into a tailspin. (Elliott Decl. ¶ 91). In his opinion, Mr. Chaffin will likely have an exacerbation of his symptoms resulting in hospitalization if he is required to leave his SOURCE home and if loses the provision of the services that he receives through SOURCE. (Elliott Decl. ¶ 93).

According to Dr. Elliott, packing Mr. Chaffin's belongings or transporting him to a new place would cause him to experience severe anxiety and would also

cause exacerbation of symptoms and hospitalization.  Mr. Chaffin would likely be a harm to himself or others if this happens.    (Elliott Decl. ¶ 94).

## ARGUMENT

I.    Plaintiffs Meet the Standard For Granting Preliminary Injunctive Relief.

In deciding a Motion for Preliminary Injunction, the Court must determine (1) whether Plaintiffs are likely to succeed on the merits; (2) whether they are likely to suffer irreparable harm in the absence of the preliminary relief; (3) if the balance of hardships favors the Plaintiffs; and (4) whether the injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. ____, 129 S. Ct. 365, 374 (2008); Ingram v. Ault, 50 F.3d 898 (11th Cir. 1995).   Plaintiffs meet each of the four elements and should receive injunctive relief to preserve the status quo. [3]

---

[3] Ultimately, some or all of the Plaintiffs may be entitled to receive services in more integrated settings than personal care homes subsidized through ALS (such as in their own homes and apartments with staff supports).  In this Motion for Preliminary Injunction, Plaintiffs seek maintenance of the status quo to avoid the irreparable harm of institutionalization and exacerbation of Plaintiffs' illnesses.

A.    <u>Plaintiffs are likely to succeed on the merits.</u>

      1.    <u>The termination of Plaintiffs' services places Plaintiffs at risk of</u>

          <u>institutionalization and violates the Americans with Disabilities Act.</u>

Under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 and

Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, Plaintiffs

are entitled to receive services available from the state in the most integrated

appropriate environment.  For Plaintiffs, this means they are entitled to at least those

services that they currently receive under SOURCE that enable them to live in the

community.  With these services provided in a community setting, they can avoid

the need to receive those same services (and many other more expensive services) in

institutional settings.  Plaintiffs will show below that they meet the three-pronged

test under the ADA and Section 504 to entitle them to continue to receive their

community services.

      2.    <u>The ADA and Section 504</u>

Section 504 prohibits disability-based discrimination by recipients of federal

funding such as Defendants.  The ADA extends the provisions of section 504 to

prohibit discrimination by all public entities. The ADA and Section 504 will be

analyzed together in this brief because "there is no significant difference in the

analysis of rights and obligations created by the two." <u>Zukle v. Regents of Univ. of</u>

Cal., 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999); Fisher v. Okla. Health Care Auth.,

335 F.3d 1175, 1179 n.3 (10th Cir. 2003).

Unjustified isolation of persons with disabilities, especially in institutions, is a

form of discrimination prohibited under the ADA and Section 504. 42 U.S.C. §

12101; Olmstead v. L.C., 527 U.S. 581, 597 (1999) (ADA); Frederick L. v. Dep't of

Pub. Welfare of the Commonwealth of Pa., 364 F.3d 487, 491 (3d Cir. 2004) (ADA

and Section 504). The ADA and Section 504 specifically mandate that individuals

with disabilities be integrated into the community to the greatest extent possible. 28

C.F.R. § 35.130(d) (2009) (public entities must "administer services, programs, and

activities in the most integrated setting appropriate to the needs of qualified

individuals with disabilities."); 28 C.F.R. § 41.51(d) (2009) (Under § 504, same

integration mandate applies to agencies receiving federal financial assistance).

Under the integration mandate, public entities are required to provide treatment for

individuals in community settings rather than in institutions where possible.

Olmstead, 527 U.S. at 597.

To meet its obligation to integrate people from institutions into community

settings, the State of Georgia has used the SOURCE program to provide community

supports to people with mental illnesses who would otherwise be at risk of

institutionalization. Georgia now proposes to terminate Plaintiffs' access to the

27

SOURCE services that have supported them in community placements.  Plaintiffs

face significant risk of institutionalization due to the termination of their SOURCE

benefits.  Plaintiffs do not need to wait until they are institutionalized to bring a

claim under the integration mandate.  Risk of institutionalization is sufficient to

demonstrate a violation of the ADA's integration mandate.  Fisher v. Okl. Health

Care Auth., 335 F.3d 1175, 1184 (10th Cir. 2003) (imposition of cap on prescription

medications placed on participants in community-based program at high risk for

premature entry into nursing homes in violation of the ADA); Brantley v. Maxwell-

Jolly, 656 F. Supp. 2d 1161, 1170 (N.D. Cal. 2009); (holding that Medicaid

participants not currently institutionalized but at "high risk for premature entry into

a nursing home" could bring claim for violation of the integration mandate);  V.L. v.

Wagner, 669 F. Supp. 2d 1106, 1119 (N.D. Cal. 2009) ("serious risk of being forced

to move out of their homes to the less integrated setting of institutions."); Mental

Disability Law Clinic v. Hogan, 2008 U.S. Dist. LEXIS 70684 at *50 (E.D.N.Y.

Aug. 28, 2008) ("even the risk of unjustified segregation may be sufficient under

Olmstead") .

As the Supreme Court held in Olmstead, the integration mandate requires that

persons with disabilities be served in the community when: (1) the state's treatment

professionals have determined that community placement is appropriate; (2)

community placement is not opposed by the individual; and (3) the placement can be reasonably accommodated, taking into account the resources available and the needs of others with disabilities. <u>Olmstead</u>, 527 U.S. at 587.   There is no dispute that Plaintiffs satisfy the first two prongs of the integration mandate.  The State has determined that community placement is appropriate for Plaintiffs in the past by providing SOURCE services.  The change in the provision of SOURCE is not due to a change in the Plaintiffs' ability to live in the community but a change in eligibility for SOURCE.  All Plaintiffs wish to continue to live in a community setting.

> 3.    <u>Defendants must make reasonable modifications to their programs to accommodate Plaintiffs.</u>

The third prong of the Olmstead test requires the public entity to make "reasonable modifications in policies, practices, or procedures" so as to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7); <u>Olmstead</u>, 527 U.S. at 604.  Here, it cannot be disputed that the State is capable of making the "reasonable modifications" necessary to avoid discrimination, since it has been doing so for many years.  Georgia continues to operate the SOURCE program.  The only reason Georgia asserts for denying Plaintiffs services under the program is that the state voluntarily changed the eligibility criteria so Plaintiffs no longer meet those criteria.  Initially the services provided by SOURCE were available under the

Georgia State Medicaid Plan (Aff. of Ivey in Heard, ¶ 3) and so were available to all individuals receiving Medicaid services who qualified.

However on October 1, 2007, the state shifted the SOURCE program from the general state Medicaid program to the Home and Community Based Services Elderly and Disabled Waiver (HCBS Waiver). (Aff. of Ivey in Heard, ¶ 3)   This had the effect of making eligibility for SOURCE services dependent on meeting the requirements of the HCBS Waiver.  This limited eligibility to people with physical disabilities only.  In effect, Georgia eliminated services under the SOURCE program for individuals with mental illnesses and developmental disabilities.  While the relevant change was apparently made in 2007, all of the Plaintiffs were approved for SOURCE services after that time.  It is not clear that Georgia even intended to eliminate SOURCE eligibility for individuals with mental disabilities.  Long after the date of this change, as recently as February 2010, Commissioner Shelp specifically pointed to SOURCE as an important program providing community placements to individuals with mental disabilities when he declared that Georgia had "opened the SOURCE program to the mental health and developmentally disabled population."  (Decl. Shelp ¶ 41).

It was not until recently that Georgia began terminating SOURCE services for individuals with mental disabilities without providing alternatives to SOURCE or

otherwise accommodating Plaintiffs.  Georgia could have kept the SOURCE

program in its State Medicaid Plan or provided similar services through its State

Medicaid Plan so that all Plaintiffs would have remained eligible.  Changing

Medicaid eligibility criteria for home delivered services that results in the risk of

institutionalization violates the integration mandate. <u>V.L. v. Wagner</u>, 669 F. Supp.

2d 1106, 1119 (N.D. Cal. 2009).  Termination of services in community settings

which will cause the plaintiffs to be provided services in less integrated settings is a

violation of the ADA that will support entry of preliminary injunctive relief. <u>Marlo

M. v. Cansler</u>, 679 F. Supp. 2d 635, 638-39 (E.D.N.C. 2010).

Alternatively, Georgia could serve those Plaintiffs who have mental illnesses

through a program under Section 1915(i) of the Social Security Act.  Dr. Shelp

stated in his February 2010 Declaration that the State had applied to CMS to provide

home and community based services to individuals with mental illness using Section

1915(i).  (Shelp Decl. ¶ 42).  As an alternative, Georgia could serve the Plaintiffs

with developmental disabilities through its NOW or COMP Medicaid Waivers,

which provide services to individuals with developmental disabilities.  (Shelp Decl.

¶ 41).  Finally, as an alternative, Georgia could serve Plaintiffs by using state funds

to pay for the SOURCE services it voluntarily eliminated from its State Medicaid

Plan.  Plaintiffs requested that services be provided to them as a reasonable

accommodation in letters sent to Defendants, but no accommodation was provided. (July 19, 2010 Letter to Defendants; June 29, 2010 Letter to DBHDD, March 31, 2010 Letter to DCH). The integration mandate does not permit a state to avoid its obligation to those under the ADA at risk of unnecessary segregated confinement by terminating services which were undisputedly reducing or eliminating the risk without assuring that alternative risk-preventive services are in place.  Cansler, 679 F. Supp. 2d at 638-39.

Here all Plaintiffs ask is that the state not decrease benefits that they have been receiving through the SOURCE program.   Courts have held that even requiring a State to increase the number of people who receive services in the community is not an unreasonable accommodation. Fisher, 335 F.3d at 1182-83; Frederick L. v. Department of Public Welfare, 422 F.3d 151, 158-59 (3d Cir. 2005)(State must increase the number of community placements for persons in institutions); Radaszewski v. Maram, 2008 U.S. Dist. LEXIS 24923 * 39-41 (N.D. Ill. Mar. 26, 2008)(Expansion of services available in the community is a reasonable accommodation, even though it may necessitate an additional Medicaid waiver ); Haddad v. Arnold, 3:10-CV-414 (M.D. Fla. July 9, 2010)(Preliminary injunction granted requiring state to provide community services to plaintiff who otherwise would be required to go into a nursing home to promptly obtain access to services).

Courts have resolutely refused to allow states to backslide on their obligations to provided integrated services under <u>Olmstead</u>.  States simply are not allowed to withdraw resources from community placements in ways that will result in more institutionalization.   <u>Fisher v. Okl. Health Care Auth.</u>, 335 F.3d at1184; <u>Marlo M. v. Cansler</u>, 679 F. Supp. 2d at 638-39; ;  <u>V.L. v. Wagner</u>, 669 F. Supp. 2d at 1119; <u>Brantley v. Maxwell-Jolly</u>, 656 F. Supp. 2d 1161, 1170 (N.D. Cal. 2009)(State may not decrease the availability of adult day health care services because this will increase the risk of institutionalization); *see* Charles R. Bliss and C. Talley Wells, *Applying Lessons from the Evolution of Brown v. Board of Education to Olmstead: Moving from Gradualism to Immediate, Effective, and Comprehensive Integration*, 26 Ga. St. U. L. Rev. 705, 724-26 (2010).

Presently, Plaintiffs require the 24 hour supervision and aid they receive in order to maintain their placement in the community.  Failure to authorize Plaintiffs for state funded community services, and failure to make reasonable modifications to the rules, policies, and procedures governing SOURCE will result in Plaintiffs' loss of twenty-four hour care and their forced isolation and segregation in harmful institutional settings or other inappropriate settings against their will in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35. 101, *et seq.*

It would be a reasonable accommodation to either require the Defendants to continue to provide SOURCE services to Plaintiffs or to require Defendants to provide equivalent alternative services.  SOURCE continues to operate for other eligibility groups. SOURCE providers are familiar with Plaintiffs and the services they require.  The cost of community services under SOURCE is far less than the cost of institutional services.  Specifically, as mentioned above, the ALS program, which is the core service for five of the six Plaintiffs, costs the state $35.00 a day, whereas a day at Georgia Regional Hospital is $362.00.  Even if requiring substantial additional expenditures to keep an individual in a community setting is necessary, such action may be a reasonable accommodation. Radaszewski, 383 F.3d at 613-15.  Here the accommodation requested will likely save the state money by avoiding institutional costs and it is clearly reasonable.

   B.    Plaintiffs will suffer irreparable injury without injunctive relief.

   A preliminary injunction is necessary to prevent Plaintiffs' from being institutionalized due to loss of state-funded services.  Plaintiffs seeking preliminary relief must demonstrate that they are likely to suffer irreparable injury in the absence of an injunction.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. _, 129 S. Ct. 365, 374 (2008); Los Angeles v. Lyons, 461 U.S. 95, 103, 103 S.Ct. 1660 (1983). Irreparable injuries are those that are non-compensable or cannot be adequately

34

compensated by money damages, such as emotional, psychological, and physical

damage. Cate v. Oldham, 707 F.2d 1176, 1189 (11th Cir. 1983). "The denial of

medical benefits, and resultant loss of essential medical services, constitutes an

irreparable harm. . . ."  Edmonds v. Levine, 417 F. Supp. 2d 1323, 1342 (S.D. Fla.

2006).

 Loss of community services that causes the possibility of institutionalization

or other less integrated living environments is irreparable harm. Washington v.

DeBeaugrine, 658 F. Supp. 2d 1332, 1339 (N.D. Fla. 2009)(" Withholding benefits

essential to a disabled person's ability to remain in the community rather than in an

institution rather obviously would constitute irreparable harm."); Marlo M. v.

Cansler, 679 F. Supp. 2d at 638 (E.D.N.C. 2010)(Being forced from community

setting causes irreparable harm); Brantley v. Maxwell-Jolly, 656 F. Supp. 2d 1161,

1170-71 (N.D. Cal. 2009)(Preliminary injunction granted to prohibit two day a week

reduction in adult day care services because such a reduction threatened a risk of

institutionalization).

Plaintiffs are likely to suffer irreparable injury if this Court does not grant

them injunctive relief preventing the termination of their community based services.

If Plaintiffs lose services, Plaintiffs will face the prospect of immediate deterioration

of their condition and institutionalization.

C.   <u>The balancing of hardships favors the Plaintiffs</u>.

The balance of hardships favors Plaintiffs.  When "faced with[] a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983).  Courts have repeatedly found that the balancing of hardships favors the preliminary continuation of community based services. <u>Marlo M. v. Cansler</u>, 679 F. Supp. 2d 638-39 (E.D.N.C. 2010); <u>V.L. v. Wagner</u>, 669 F. Supp. 2d at 1122; <u>Brantley v. Maxwell-Jolly</u>, 656 F. Supp. 2d 1161, 1177 (N.D. Cal. 2009).

Currently, the care Plaintiffs are receiving is far below the estimated cost of caring for Plaintiffs' in an institutional setting.  Plaintiffs will incur serious harm, both mental and emotional, as a result of the substantial cut to their services.  The comparative harm to Defendants, however is small.

D.   <u>The public interest demands that the injunction be granted</u>.

There is a "robust public interest in safeguarding access to healthcare for those eligible for Medicaid, whom Congress has recognized as 'the most needy in the country.'" <u>Independent Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly</u>, 572 F.3d at 659.  The public interest includes protecting the rights of individuals with disabilities.  <u>Lopez</u>, 713 F.2d at 1437 ("Our society as a whole suffers when we

neglect the poor, the hungry, the disabled, or when we deprive them of their rights

or privileges").  The interest of the citizens of Georgia is best served by enjoining

Defendants from enforcing arbitrary cuts and denials of necessary services for

Plaintiffs.  The ADA requires that persons with disabilities be provided services in

the most integrated settings possible, which is being directly undermined by

Defendants' actions.  Such care is less expensive than institutional care.  Certainly

the public interest is served by an injunction.  See, e.g., <u>Mitson v. Coler</u>, 670 F.

Supp. 1568, 1577 (S.D. Fla. 1987) (the public interest will benefit "in that seriously

ill, aged veterans will receive essential medical care that could not otherwise be

provided").

II.    <u>The Court Should Not Require a Bond.</u>

The Eleventh Circuit has held that a district court has discretion to waive the

security requirement in appropriate cases. See <u>BellSouth Telecomms., Inc. v.</u>

<u>MCIMetro Access Transmission</u>, 425 F.3d 964, 971 (11th Cir. 2005). In a case in

this circuit in which a preliminary injunction was granted to provide community

services to avoid the risk of institutionalization, bond was not required. <u>Washington</u>

<u>v. DeBeaugrine</u>, 658 F. Supp. 2d 1332, 1339 (N.D. Fla. 2009).   Given the high

likelihood of success on the merits, Plaintiffs' status as public assistance recipients

due to their disabilities, and the fact that the injunction seeks merely to require

Defendants to comply with federal law, no bond should be issued.

## CONCLUSION

This Court should grant the Motion for a Preliminary Injunction.

Respectfully submitted,


/s/ C. Talley Wells_____        /s/ Charles R. Bliss_____
C. Talley Wells                      Charles R. Bliss
Georgia Bar No. 747657               Georgia Bar Number 063385
Atlanta Legal Aid Society, Inc.      Atlanta Legal Aid Society, Inc.
246 Sycamore Street                  151 Spring Street NW
Decatur, GA 30030                    Atlanta, GA 30303
404-377-0705 ext. 282 (phone)        (404) 614-3988
404-377-2349 (fax)                   (404) 614-3997 (fax)
**ctwells@atlantalegalaid.org**      **crbliss@atlantalegalaid.org**

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that the foregoing has been prepared in Times

New Roman (14 point) font, as approved by the Court in L.R. 5.1.B.


/s/ C. Talley Wells_____
C. Talley Wells
Georgia Bar No. 747657
Counsel for Plaintiffs